GRANT K. HAGESTAD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hagestad v. Commissioner
Docket No. 11303-91
United States Tax Court
T.C. Memo 1993-300; 1993 Tax Ct. Memo LEXIS 305; 66 T.C.M. (CCH) 87; July 13, 1993, Filed *305 Decision will be entered under Rule 155. In order to more easily obtain loans from shareholders, employees, and certain other persons, C developed a system allowing those lenders to take advances against amounts on loan by them to C. An additional provision allowed lenders to receive interest on the full amount loaned so long as any advances were restored to C by the end of its January 31 fiscal year. Pursuant to C's system, P took advances in 1986 against amounts then on loan by him to C. All of the advances were restored by P to C in January 1987. R determined that the advances taken by P in 1986 constituted gross income to the extent of the compensation paid by C to P in 1987. Held: Advances made from C to P in 1986 against amounts already on loan by P did not constitute gross income. For petitioner: Jon T. Flask. For respondent: Richard D. Fultz. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency dated March 8, 1991, respondent determined deficiencies and additions to tax against petitioner as follows: Additions to Tax Sec.
Sec. Sec. Sec. Sec.
Year
Deficiency
6653(a)(1)
6653(a)(1)(a)
6653(a)(1)(B)
6659 6661
1986
$ 280,125
- $ 14,006
[1]
-  $ 30,038
1988
12,445
$ 622
-  -
$ 3,734
-
*306 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by the parties, the issue remaining for decision is whether petitioner had additional taxable income in the amount of $ 360,000 for his 1986 taxable year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioner resided in Portola Valley, California. For 1986, 1987, and 1988, petitioner was a cash-method taxpayer who made his return on the basis of a calendar year. Estate Homes of Northern California
Estate Homes of Northern California, Inc. (EHNC) is a real estate company engaged in the business of acquiring, developing, and selling both improved and unimproved real estate. EHNC is a subchapter C corporation making its returns on the basis of a January 31 fiscal year. EHNC was organized in 1970. Petitioner was a founding shareholder. During 1986, 1987, and 1988, petitioner owned *307 slightly less than 50 percent of EHNC's outstanding shares. Petitioner also was on the board of directors (board) of EHNC. During those years, the board met formally once or twice a year, while informal management meetings involving various members took place at least weekly, and often more frequently. Petitioner also was president and chief operating officer. His duties were substantial. EHNC performed most of its accounting functions internally. Betty Gravdahl (Gravdahl) began working for EHNC in 1984, and, by the end of EHNC's 1986 fiscal year, was performing significant accounting work for EHNC. At the time of trial, Gravdahl was the chief financial officer and corporate secretary for EHNC. At that time, she also was a member of the board. From its inception, EHNC has had the need for substantial debt financing. Initially, all of EHNC's shareholders were called upon to guarantee such financing. Eventually, however, petitioner became the sole guarantor of most bank loans to EHNC and its affiliates. During 1986, 1987, and 1988, petitioner guaranteed approximately $ 10 to $ 15 million in bank loans. EHNC also had initiated a program of individual and shareholder loans *308 (the noncommercial loan program) as an additional source for financing the company's endeavors. The noncommercial loan program was desirable to EHNC because loans received under it were more stable and less risky than bank loans. They did not require annual renegotiation or personal guarantees. Moreover, loans received under the program were less expensive to EHNC than bank financing because no points or fees were charged. The availability of such loans increased the total amount of debt capital available to EHNC. Shareholders of EHNC made loans to the corporation on a voluntary basis, and the loans of such shareholders bore no relationship to the percentage interest they held in the corporation. Two long-term loans were made to EHNC under the noncommercial loan program on December 31, 1983. One loan was of $ 600,000, made by the Grant Hagestad Family Trust (Family Trust), a trust controlled by petitioner. The second was of $ 1,400,000, made by a shareholder, Owen D. Gilman. Both loans were evidenced by promissory notes with a maturity date of December 31, 1988, and provided for interest at an annual rate of 15 percent. At least as of December 31, 1986, the $ 600,000 loan *309 from the Family Trust remained unrepaid, and was outstanding in full. On February 1, 1986, the following additional loans were made to EHNC under the noncommercial loan program: Lender
Amount
Grant Hagestad (petitioner)
$ 219,700
Owen D. Gilman
943,171
L.W. Phillips, Jr. Trust
339,953
Betty Gravdahl
35,621
Betty Gravdahl
10,475
Family Trust
266,024
All of those loans were evidenced by notes, which were payable on demand and earned interest of 13-1/2 percent a year. The $ 219,700 loan from petitioner remained unrepaid on December 31, 1986. EHNC's Pullback System
In October 1985, the Board of Directors of EHNC adopted the following resolution: RESOLVED, that advances or draws may be made by individuals who have loaned money to the corporation without loss of interest on the original principal that was loaned to the company. Individuals are to repay the advances.
That resolution officially authorized a system (the pullback system) by which EHNC made payments (each a pullback) to individuals having made loans to EHNC under the noncommercial loan program. In effect, a pullback was a repayment to the individual of money previously lent to EHNC *310 by that individual. So long as the amount of a pullback received during one of EHNC's fiscal years was returned before the close of that fiscal year, the lender would receive interest on the amount pulled back as if it had never been taken from the corporation. In the event that a pullback was not returned by the close of EHNC's fiscal year, the amount of the pullback would be subtracted from the outstanding balance of the lender's loan to EHNC and the interest due to the lender for that year from the date of the pullback would be calculated on that basis. For example, in one instance Gravdahl failed to repay a $ 10,000 pullback by fiscal yearend. As a result, her outstanding demand loan balance with EHNC was reduced by $ 10,000. Moreover, the interest paid her on the loan from the date of the pullback was calculated accordingly. The pullback system was intended to motivate individuals to lend funds to EHNC, by allowing them limited access to such funds. Although the pullback system resulted in interest being paid by EHNC on funds that, temporarily, had been repaid, that cost was considered minor in comparison to the convenience, certainty, stability, and relatively low cost *311 of loans under the noncommercial loan program. The pullback system encouraged the restoration of pulled-back amounts by the end of the corporation's fiscal year, which simplified accounting and cash-flow planning. The limited availability of corporate funds operated as a practical limitation on the availability of pullbacks. Occasionally, unavailability of funds resulted in some delay if a large pullback request was received. When an individual wished to utilize the pullback system, he would request a check from the EHNC accounting department. The EHNC accounting department maintained an "account receivable" record for each individual participating in the pullback system. The account receivable would be increased whenever an individual pulled back a portion of his loan to EHNC, and it would be decreased whenever that advance was repaid within the appropriate time period. As of any time, the amount available for pullback by a lender could be calculated by subtracting the account receivable balance from the total loans from that lender to EHNC. The pullback system was available to any individual making a loan to EHNC under the noncommercial loan program. At least four individuals, *312 in addition to petitioner, used the system. Petitioner's Pullback Activity
Although the extent of an individual's pullback capacity generally was limited to the amount previously loaned by the individual to EHNC, petitioner was able to pullback amounts from loans made directly by him as well as from those made by the Family Trust. At the beginning of EHNC's 1987 fiscal year (February 1, 1986), petitioner had an account receivable balance of zero, indicating that he then was in possession of no pulled-back funds from EHNC. By December 31, 1986, however, he had pulled back $ 294,875 and had an account receivable balance in that amount. Petitioner's largest account receivable balance during the period February 1, 1986, through December 31, 1986, was $ 294,875. Petitioner restored all of those pullback amounts through five separate credits to the account during January 1987. The first of those credits was for the net salary due petitioner in January 1987, which credit was in the amount of $ 128,605. The second credit was for interest due petitioner from EHNC, which was in the amount of $ 31,391. The other three credits were in the amounts of $ 50,000, $ 34,877, and $ 50,000, *313 which represented third-party checks endorsed by petitioner to EHNC. Petitioner's Compensation
In October 1985, at the same time that EHNC's board established the pullback system, the board also resolved to pay petitioner an annual (calendar year) base salary of $ 240,000. Petitioner's base salary was intended as compensation both for the work he was to perform during the coming year and for his role as guarantor of the EHNC bank loans. In at least one earlier year, cash flow considerations had prevented petitioner from receiving his full salary in that year. For that reason, and because petitioner's loan guarantees were in place for the entire year, petitioner requested, and received, his full base salary for 1986, 1987, and 1988 in January of each such year. Petitioner also was entitled to a yearly bonus, based both on corporate profits and petitioner's performance during the preceding corporate fiscal year. Those bonuses traditionally were paid by EHNC in January, for the fiscal year then just ending. On January 31, 1986, petitioner was paid $ 260,000 by EHNC. Of that amount, $ 240,000 represented petitioner's salary for services to be rendered during the 1986 calendar *314 year, while the remaining $ 20,000 constituted a first bonus payment for petitioner's services rendered during EHNC's fiscal year ending January 31, 1986. Petitioner received additional bonus payments during 1986 as follows: Date
Amount
02/28/86
$ 20,000
03/31/86
20,000
04/30/86
20,000
05/31/86
20,000
06/30/86
20,000
07/31/86
20,000
12/31/86
12,000
Each of those payments represented a portion of petitioner's bonus for services rendered during EHNC's fiscal year ending January 31, 1986. Petitioner's total bonus for that year was $ 152,000. Bonus payments to petitioner were spread throughout 1986 by EHNC, rather than made in one lump sum on January 31, 1986, as a result of cash flow considerations. On his 1986 individual income tax return, petitioner reported the amount of $ 392,000 as compensation from EHNC ($ 240,000 calendar year salary plus $ 152,152 fiscal year bonus equals $ 392,152). On January 31, 1987, petitioner was paid $ 360,000 by EHNC. That amount included $ 240,000 in base salary for calendar year 1987 and a $ 120,000 bonus payment for EHNC's 1987 fiscal year (then just ending). As recorded in EHNC's general ledger (the ledger), the $ 120,000 *315 bonus payment was not paid to petitioner in cash. Rather, it was recorded as a loan to EHNC by the Family Trust, under the noncommercial loan program. At petitioner's direction, a portion of the salary due him, $ 128,606, was credited against the pullback payments made from EHNC to petitioner during 1986. Petitioner reported the full $ 360,000 received by him as compensation and bonuses in January 1987 as income on his 1987 Federal income tax return. OPINION During 1986 and 1987, petitioner was an officer of EHNC and a substantial shareholder therein. For 1986, petitioner reported on his Federal income tax return compensation from EHNC of $ 392,000. Respondent does not challenge that item. For 1987, petitioner reported on his Federal income tax return compensation from EHNC of $ 360,000. Respondent would move that $ 360,000 from 1987 to 1986, arguing, primarily, that such $ 360,000 was additional compensation received during 1986. Petitioner assigns error to respondent's determination that petitioner had additional income in such amount for 1986. Petitioner acknowledges receiving $ 294,875 from EHNC during 1986 in addition to the $ 392,000 compensation he reported as income. *316 Respondent claims that, in addition, the Family Trust received $ 156,720 from EHNC during 1986 that should be treated as received by petitioner. Petitioner does not object to respondent's characterization of the Family Trust as "a trust for which petitioner was treated as the owner under I.R.C.§ 671." Because of that agreement, we will accept, without deciding, that any income otherwise taxable to the Family Trust is taxable to petitioner. See sec. 671. Petitioner argues that the $ 294,875 he received and the $ 156,720 that respondent claims the Family Trust received were payments made pursuant to EHNC's "pullback" system. That system worked in conjunction with EHNC's noncommercial loan program. The noncommercial loan program was undertaken to encourage shareholders, employees, and certain others to make loans to EHNC. Under the pullback system (explained in more detail, supra), persons with outstanding noncommercial loans to EHNC could ask for the return of amounts loaned to EHNC without loss of any interest due the lender if the amount returned (pulled back) was restored to the corporation by the corporation's fiscal yearend (January 31). Calling the payments in question *317 as either loans or repayments of loans, petitioner argues that the payments in question did not constitute gross income under section 61. Respondent does not challenge the legitimacy of the noncommercial loan program or the pullback system generally. Respondent contends simply that the amounts in question were actual receipts of gross income in 1986, which, by subterfuge, petitioner and EHNC attempted to characterize as 1987 base compensation, paid in January 1987. See Tussaud's Wax Museums, Inc. v. Commissioner, T.C. Memo. 1966-211 (draws from corporation in 1962 that, in 1963, were charged against salary then accrued did not give rise to bona fide debt in 1962 and were, in reality, payment of compensation for services rendered in 1962, taxable as such in 1962). Alternatively, respondent claims that the payments in question, if not compensation, constituted a taxable dividend to petitioner in 1986. See secs. 301, 316. Since respondent does not question the pullback system generally, it is helpful to focus first on whether or not the payments in question were pullbacks under that system. Petitioner has introduced testimony and *318 other evidence that describes the noncommercial loan program and the pullback system. The parties agree, and we have found, that, as of February 1, 1986, demand loans from petitioner and the Family Trust to EHNC under the noncommercial loan program were outstanding in the amounts of $ 219,700 and $ 266,024, respectively. The parties also agree, and we have found, that petitioner made a long-term loan of $ 600,000 to EHNC on December 31, 1983, such loan evidenced by a note with a maturity date of December 31, 1988. Petitioner concedes, and we have found, that $ 294,875 was the largest balance outstanding to him under the pullback system between February 1, 1986, and December 31, 1986. Respondent claims that another $ 156,720 was received by petitioner by way of the Family Trust during 1986 and was outstanding at the close of that year. [1] The total of those two amounts is $ 451,595. It is respondent's position that (1) not one dollar of either the demand loans or the long-term loan was outstanding on December 31, 1986, (2) all such loans had been repaid previously, and therefore, (3) the purported pullbacks ($ 451,595 according to respondent) were, indeed, not pullbacks *319 on December 31, 1986 (since not matched by any outstanding loan balance). Petitioner, insisting that the loans in question were outstanding in at least the amount of $ 451,595, does not go further and address the consequence of a finding that the loans were not outstanding in at least that amount. We assume that, if we were to so find, petitioner would concede an item of gross income in the amount of the shortfall. *320 We have found that, as of December 31, 1986, the $ 600,000 long-term loan from the Family Trust remained unrepaid, and was outstanding in full. We also have found that, as of that date, the $ 219,000 demand note from petitioner remained unrepaid, and was outstanding in full. With regard to the long-term note, our finding is based in part on the terms of the note, which did not call for payment until December 31, 1988. We have also taken into consideration the accounting records in evidence, which convince us that such debt remained outstanding at least through December 31, 1986, although, as explained by petitioner on brief, moved from account to account on the books and records of EHNC both before that date and thereafter. Our conclusion with regard to the $ 219,000 demand note is based primarily on the books and records in evidence, which we believe constitute evidence that a demand note to petitioner in at least that amount was outstanding on December 31, 1986. [2] Our findings with regard to the long-term loan and the demand note can thus be combined to support a finding that loans in the amount of $ 819,000 from petitioner to EHNC were outstanding on December 31, 1986. *321 Having so found, we believe that we have disproved an essential element of respondent's logic, viz, that the payments in question were not pullbacks (and were items of gross income) because not matched at yearend by equal and offsetting liabilities from EHNC to petitioner. Nevertheless, we still need to conclude, as a matter of law, that the receipts in question did not otherwise constitute an item of gross income to petitioner. However the receipts were characterized, be it as payments, repayments, or loans, we believe that, at fiscal yearend, EHNC would reduce its liability to repay to petitioner (or the Family Trust) amounts previously borrowed from petitioner (or the Family Trust) in an amount equal to the so-called pullbacks then outstanding. We also believe that no pullback payment would be made by EHNC unless there was a sufficient net balance owing from the corporation to the requesting party. We are satisfied to conclude that the pulled-back amounts constituted repayments of loans and should be treated accordingly. They thus did not constitute an item of gross income taxable under section 61. On that basis, we hold for petitioner on this issue. Decision will be *322 entered under Rule 155.
Footnotes
1. 50% of the interest due on $ 280,125.↩
1. Although such claim clearly is made by respondent in the argument portion of her opening brief (p. 22), respondent has made no corresponding proposed finding of fact as to that or any other particular dollar amount with regard to the Family Trust. Respondent simply has proposed as a finding of fact (no. 24) that account activity reflecting the dates and amounts of "draws and advances" were recorded in a particular EHNC account receivable. Portions of EHNC's books and records are in evidence. We refuse, however, to rummage through numerous pages of complicated accounting documents to make difficult calculations in which, even were we to do so, we would have little confidence. Petitioner has not requested any finding of fact limiting the amount received by the Family Trust. We thus have made no finding with regard to the amount received by the Family Trust during 1986.↩
2. Respondent's proposed finding of fact (no. 40) on that issue is curious. Respondent requests us to find that, "as of January 31, 1987, petitioner's demand note from EHNC had been paid in full." (Emphasis added.) Petitioner agrees with that narrow statement but points out that the accounting record in question shows that a payment settling the account was made on↩ Jan. 31, 1987. Petitioner's point, we assume, is that the evidence is that the account was not settled before then. We agree.